# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| CTI III, LLC,<br>　　　　　　Plaintiff<br><br>v.<br><br>BLAKE PETERS and PETERS SPECIALTY<br>TAX SERVICES LLC,<br>　　　　　　Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.: 4:26-cv-1465 |

## COMPLAINT

Plaintiff CTI III, LLC ("CTI"), through its undersigned counsel, hereby files suit against Defendants Blake Peters ("Peters") and Peters Specialty Tax Services LLC ("PSTS") (collectively "Defendants") and alleges as follows:

## I.　INTRODUCTION AND NATURE OF THE ACTION

1.　Plaintiff CTI is a highly respected tax consulting firm and the former long-time employer of Defendant Blake Peters.  In August 2025, while Peters was still employed by CTI as an R&D Director, Peters secretly formed a competing tax consulting firm: Defendant Peters Specialty Tax Services LLC.  Peters then resigned from CTI and misled CTI by telling CTI he didn't know what he would be doing next.

2.　In reality, Peters and PSTS set to work soliciting CTI's clients and misusing CTI's confidential information that Peters had gained through his employment at CTI—all in violation of Peters' agreements with CTI and other applicable law.  This misconduct has caused

and will continue to cause irreparable harm to CTI, including disruptions to CTI's client relationships and the loss of a key client.

3.     This lawsuit seeks emergency and preliminary injunctive relief to enjoin Peters' contractual breaches and Defendants' other misconduct and prevent them from unlawfully poaching CTI's clients.  CTI's claims against Peters are subject to a contractual arbitration requirement; therefore, CTI seeks preliminary injunctive relief and the discovery necessary to obtain such relief—as expressly authorized by the governing arbitration agreement—until its claims against Peters may be resolved in arbitration.  CTI intends to seek further judicial consideration only to the extent the arbitration does not fully resolve its claims.

## II.  **PARTIES**

4.     Plaintiff CTI is a California Limited Liability Company with its principal place of business in Folsom, California.

5.     Defendant Blake Peters is a natural person who resides and is domiciled in Texas.

6.     Defendant PSTS is a Texas Limited Liability Company with its principal place of business in Houston, Texas.

## III.  **JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is diversity of the parties and the amount in controversy exceeds $75,000.00. Diversity is complete because Plaintiff CTI's citizenship (California) does not overlap with Defendants' (both citizens of Texas).

8.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Defendants' misconduct described in this Complaint constitutes misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*

The Court has supplemental jurisdiction over Plaintiff CTI's state-law claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants because both Defendants are residents and citizens of Texas.  The Court also has personal jurisdiction over Defendants pursuant to Texas's long-arm statutes because Defendants have purposefully availed themselves of the benefits of doing business in Texas and have sufficient contacts with Texas for the Court to exercise personal jurisdiction over them.  As alleged below, CTI is informed and believes that Defendant Peters committed the acts constituting the breaches of contract that form the basis of Count I while physically present in Texas, and Defendants committed the acts of misconduct that form the basis of Counts II through IV while physically present in Texas, including at Defendant PSTS's principal place of business in Houston.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to the claim occurred in the Southern District of Texas, notably at PSTS's principal place of business in Houston.

11.     Jurisdiction and venue are also proper in this Court pursuant to the July 11, 2024 Voluntary Arbitration Agreement between CTI and Peters.  In Section VII of the Voluntary Arbitration Agreement, CTI and Peters agreed "that venue and jurisdiction are proper in the state of Texas" and "specifically consent to the jurisdiction and venue of such court" for "disputes arising under this Agreement that are submitted to a court rather than an arbitrator, including actions to compel arbitration, to confirm the arbitration award, or for equitable relief in aid of arbitration (which actions the parties are hereby authorized to bring)."

IV.    **FACTUAL BACKGROUND**

    A.    **CTI Has Established Itself as a Highly Respected Tax Consulting Firm, and CTI's Success Relies on Its Confidential and Proprietary Information.**

    12.    CTI was formed in 2001 and has since established itself as one of the country's most highly respected tax consulting firms. Among other services, CTI helps its clients gain the benefit of various tax incentives and thereby maximizes tax savings for its clients. CTI accomplishes this by identifying and understanding federal, state, and local tax incentives; analyzing and assessing clients' business practices to determine the applicability of various tax incentives; assembling and preparing documentation and analyses to demonstrate clients' entitlements to tax incentives; and, if necessary, defending its work and analyses in the event a client is audited.

    13.    CTI specializes in tax incentives with considerable regulatory complexity and that are not within the capabilities of an ordinary CPA or tax preparer, such as the federal R&D tax credit and R&D payroll tax offset, employment tax incentives, and property-related tax incentives related to energy efficiency and other issues. To help its clients obtain these tax benefits, CTI has invested significant time and effort in developing and maintaining several bodies of proprietary information and know-how. For example for R&D tax incentives, CTI has conducted proprietary analyses and developed proprietary knowledge about the implementation of the applicable law—which is one of the most complicated areas of the tax code—including proprietary analyses and knowledge regarding the audit process and results of audits, the defensibility of various approaches towards obtaining these tax incentives, and the specific approaches that do and do not work for obtaining these tax incentives.

    14.    CTI has also invested significant time and effort in developing and maintaining industry-specific proprietary knowledge and information. The optimal approaches towards

obtaining R&D tax incentives differs between industries (*e.g.*, software vs. manufacturing vs. architecture), and CTI has developed proprietary knowledge and information about how R&D activities are conducted and characterized under the applicable law in these various industries, how R&D tax incentives are awarded differently across industries, and which specific approaches do and do not work for obtaining these tax incentives in different industries.

15.     Further, CTI has invested significant time and effort in developing and maintaining client-specific proprietary knowledge and information.  For example, CTI has analyzed its clients' employment and time-tracking practices, job-costing practices, contracts with customers and vendors, and other client-specific information to reach conclusions about the applicability of R&D tax incentives for a particular client and the optimal strategy for the client to obtain R&D tax incentives.

16.     In addition to the confidential subject-matter knowledge described above, CTI also relies on confidential and proprietary business information, including customer identities, customer lists, customer contact information, and contract terms such as pricing information and fee arrangements.

17.     CTI considers the proprietary information described above to constitute CTI's trade secrets.  CTI's trade secrets derive independent economic value from not being generally known to the public or to persons who can obtain economic value from their use.  In particular, CTI's trade secrets provide a competitive advantage in the marketplace, for example by enabling CTI to outperform its competitors by providing greater tax savings for its clients, by providing comparable tax savings at a lower level of risk, and/or by providing more defensible documentation in the event a client's taxes are audited or scrutinized.  If CTI's competitors knew CTI's trade secrets, they could use them to eliminate CTI's competitive advantage, for example

by offering services that would close the gap in savings, risk, and/or defensibility between CTI and the rest of the market.

18.     Because CTI's trade secrets and other proprietary information are critical to its business success, CTI takes extensive measures to protect them.  Among other measures, CTI requires all employees to agree to comprehensive confidentiality agreements; CTI's Employee Handbook sets forth a company policy restricting employee use of confidential information; CTI's contracts with its clients impose confidentiality obligations; CTI uses password restrictions and other IT controls on its computer systems; and even among CTI's employees, CTI restricts access to sensitive documents based on employee role.

**B.      Peters Joined CTI as an R+D Manager and Agreed to Confidentiality and Non-Solicitation Obligations.**

19.     Defendant Peters was hired for the role of R&D Manager in or around January 2017.  In connection with his hiring, Peters entered into a Confidentiality and Intellectual Property Assignment Agreement on or around January 6, 2017.  Through the Confidentiality and Intellectual Property Assignment Agreement, Peters agreed to comprehensive obligations with respect to the non-solicitation of CTI's clients and the protection of CTI's confidential information and trade secrets, among other obligations.

20.     At the time of his hiring, Peters was given an opportunity to identify any of his prior knowledge and inventions that would be excluded from Peters' confidentiality obligations to CTI.  Peters identified no such prior knowledge, inventions, or other intellectual property.

**C.      Peters' Position at CTI Gave Him Access to CTI's Confidential and Proprietary Information.**

21.     Between 2017 and 2024, Peters was promoted to and through the roles of R&D Senior Manager, R&D Associate Director, and R&D Director.  In these roles, Peters had access

to extensive amounts of CTI's confidential and proprietary information and used this information to perform his job.

  22. For example, in Peters' role as R&D Director, Peters oversaw CTI's R&D Tax Credit consulting department.  In this role, Peters was responsible for director-level reviews of all client deliverables and resolving client issues related to technical tax issues, as well as being primarily responsible for CTI's R&D Tax Credit consulting for certain key clients, among other responsibilities.  To perform these tasks, Peters needed to understand and use CTI's confidential and proprietary subject-matter information and knowledge described above, including information about the specific approaches that do and do not work for obtaining these tax incentives in different industries and for different clients, CTI's knowledge about the defensibility of different approaches towards obtaining these tax incentives, and CTI's conclusions about the applicability of R&D tax incentives for a given client in light of the client's business practices.  In this role, Peters also had access to and used CTI's client list, client contact information, and client contract terms, including pricing information and fee arrangements.  Peters' work in this role was not limited to a particular geography, and Peters served CTI's clients nationwide.

  **D.** **In July 2024, Peters Agreed to Updated Confidentiality, Non-Solicitation, Non-Interference, and Non-Competition Obligations.**

  23. In or around July 2024, CTI updated its employee handbook, employee policies, and employee agreements, and Peters voluntarily signed and agreed to these updated policies and agreements in July 2024.  The July 2024 agreements included an updated Confidentiality and Intellectual Property Assignment Agreement ("CIPAA"), which is attached hereto as **Exhibit 1**. As set forth below, the CIPAA imposed a number of contractual obligations that Peters would go on to violate, including all of the following.

---

**COMPLAINT**

1. **Peters Agreed that He Would Not Use CTI's Confidential Information (Except for the Exclusive Benefit of CTI) During His Employment and for at Least Five Years After.**

24.    Through the CIPAA, Peters ("the Employee") agreed to a number of confidentiality obligations with respect to confidential information belonging to CTI ("the Company").  For example, under Section 2.4.1 of the CIPAA, Peters agreed that he would keep this information confidential and not use this information except for the exclusive benefit of CTI:

> At all times during the Employee's employment with the Company, the Employee shall hold in trust, keep confidential, not make use of, and not disclose or reveal to any third party any Trade Secrets or Confidential Information of the Company at any time, except that the Employee may disclose Trade Secrets or Confidential Information in the performance of his/her duties for the Company and for the exclusive benefit of the Company.

25.    Under Sections 1.2 and 1.6, the terms "Confidential Information" and "Trade Secrets" were defined broadly and expressly included information such as "Client lists," "prospective Client lists," "information concerning Clients," "information concerning Client habits and special needs," "Client profiles," and "financial and accounting information, such as cost, pricing, and billing information":

> "Confidential Information" means all non-public and proprietary information or technology used in the Company's Business and treated as confidential by the Company. Confidential Information includes written and unwritten, patentable and non-patentable, copyrightable and non-copyrightable information. Confidential Information includes techniques and confidential information and compilations that the Company has or will develop, compile, or own, or that the Company receives under conditions of confidentiality. Confidential Information includes not only information disclosed by the Company (including its employees, agents, and independent contractors) or its Clients to the Employee in the course of employment, but also information (including Inventions) developed or learned by the Employee during the course of the Employee's employment with the Company. Confidential Information includes all information that has or could have commercial value or other utility in the business in which the Company or its Clients are engaged, or in which they contemplate

engaging, and all information that, if disclosed without authorization, could be detrimental to the interests of the Company or its Clients, whether or not such information is identified as Confidential Information by the Company or its Clients. Further, Confidential Information means any and all information belonging to the Company, whether reduced to writing or in a form from which such information can be obtained, translated, or derived into reasonably usable form, that has been provided to Employee the during their employment with the Company, that Employee has gained access to while working with the Company, or that was developed, enhanced, or in any way modified by the Employee in the course of the Employee's employment with the Company, and that is proprietary and confidential in nature. The Company's Confidential Information includes, but is in no way limited to, the following: (i) information concerning the nature of the Company's Business and its manner of operation; (ii) the methods, processes, and systems used by the Company in soliciting, selling, and providing its services and products to its Clients; (iii) software and related processes, data source code, and programming information (whether or not patentable or registered under copyright or similar statutes) developed by or for the benefit of the Company; (iv) any information about the Company's designs, formulas, algorithms, design technology, know-how, data collection and data compilation techniques, specifications, strategies, forecasts, and Inventions (whether patentable or not); (v) information concerning Clients; (vi) information concerning the Company's vendors and suppliers; (vii) Client lists, know-how, data collection and data compilation techniques, specifications, strategies, forecasts, and Inventions (whether patentable or not); (viii) prospective Client lists; (ix) information regarding Client habits and special needs; (x) financial and accounting information, such as cost, pricing, and billing information, Client profiles, financial policies and procedures, and revenues and profit margins; (xi) sales and marketing information, such as sales strategies and programs; and (xii) information concerning the Company's Business relationships with any other persons, firms, corporations, and other entities.

"Trade Secrets" means information that would be considered a Trade Secret under any U.S. state's codification of the Uniform Trade Secrets Act ("UTSA") or the federal Defend Trade Secrets Act of 2016 ("DTSA"), including, but not limited to, formulas, patterns, compilations, programs, devices, methods, techniques, and processes, that: (i) is not generally known in the industry, to the public, or to others who can realize economic value from its disclosure or use; (ii) has independent economic value, whether actual or potential, that derives from its secrecy; and (iii) is the subject of efforts that are reasonable under the circumstances to

maintain its secrecy.

26.     Under Section 2.7 of the CIPAA, Peters agreed that his confidentiality obligations

would continue for at least five years following the end of his employment with CTI:

> Commencement and Termination of Employee Obligations. The
> Employee understands and acknowledges that his/her obligations
> under section 2 of this Agreement with regard to any particular
> Confidential Information shall commence immediately upon his/her
> first having access to such Confidential Information (whether before
> or after the Employee begins his/her employment by the Company)
> and shall continue for the longer of: (a) such time as such
> Confidential Information has become public knowledge other than
> as a result of the Employee's breach of this Agreement or breach by
> those acting in concert with the Employee or on his/her behalf; or
> (b) the expiration of five (5) years following the termination of the
> Employee's employment from the Company for any reason;
> provided, however, that there shall be no limitation applicable to any
> Trade Secret which is protected without temporal limitation under
> applicable law.

### 2.     Peters Agreed that He Would Not Solicit CTI's Clients.

27.     Under Section 6.1.1 of the CIPAA, Peters agreed that he would not use CIPAA's

confidential information to solicit any client to terminate their relationship with CTI:

> During the Employee's employment with the Company and at all
> times thereafter, the Employee shall not, directly or indirectly,
> interfere with the Company's Business by using its Confidential
> Information to do any of the following . . . Solicit, attempt to solicit,
> recruit, induce, or otherwise cause any Restricted Person to
> terminate their relationship with the Company[.]

28.     Under Section 6.1.3, the term "Restricted Person" is expressly defined to include

CTI's clients:

> For purposes of this section 6.1, "Restricted Persons" include the
> employees, Clients, suppliers, joint venturers, investors, officers,
> independent contractors, consultants, agents, or representatives who
> had a relationship with the Company within the one-year period
> prior to the Employee's termination or separation and to whom the
> Employee provided services, with whom the Employee worked or
> otherwise solicited business on behalf of the Company, and/or about
> whom the Employee had access to Confidential Information.

---

**COMPLAINT**

### 3. Peters Agreed that He Would Not Interfere with CTI's Client Relationships.

29.     Under Section 6.1.2 of the CIPAA, Peters agreed that he would not use CIPAA's

confidential information to disrupt or interfere with any of CTI's client relationships:

> During the Employee's employment with the Company and at all times thereafter, the Employee shall not, directly or indirectly, interfere with the Company's Business by using its Confidential Information to do any of the following . . . Disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between the Company and any Restricted Person.

30.     Under Section 6.2, Peters further agreed that a Court may reform the non-solicit

and non-interference provisions to the maximum permissible duration, scope, and geography, in

the event that any of their restrictions is found to be unreasonable:

> <u>Enforcement</u>. If, at the time of enforcement of this Section 6, a court holds that the restrictions stated herin are unreasonable under circumstances then existing, the Parties hereto agree that the maximum duration, scope, or geographic area reasonable by law under such circumstances shall be substituted for the stated period, scope, or geographic area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum scope and geographical area permitted by law.

### 4. Peters Agreed that He Would Not Compete with CTI Using CTI's Confidential Information.

31.     Under Section 7.1, Peters agreed that he owed a duty of loyalty to CTI and that he

would not use CTI's confidential information to compete with CTI:

> In addition to common law and applicable statutory law concerning the Employee's duty of loyalty to the Company, during the term of the Employee's employment with the Company, the Employee will not, singly, jointly, or as an agent, employee, or consultant of any business or entity or in any other capacity, engage in any Competitive Activity as hereafter defined. Furthermore, at no time after the termination of the Employee's employment with the Company will the Employee use the Company's Confidential Information to singly, jointly, or as an agent, employee, or consultant of any business or entity or in any other capacity engage in Competitive Activity, as hereafter defined. "Competitive

Activity" for purposes of this Agreement means directly, indirectly or otherwise beneficially owning, managing, operating, joining in, controlling, or participating in the ownership, management, operation, or control of, or work for (as an employee, consultant, independent contractor or otherwise), or permitting the use of the Employee's name by, or providing financial or other assistance to, or being connected in any manner with, any Person that is engaged in or is carrying on any business that is in competition with the Company's Business or that offers services competitive with those offered by the Company during the Employee's employment.

**E.   Peters Creates a Competing Business—Defendant PSTS—while Still Employed by CTI; Peters then Resigns and Misleads CTI about His Plans.**

32.     As of August 2025, Peters was employed by CTI in the role of R&D Director. Unbeknownst to CTI, and while still employed by CTI, Peters formed Defendant Peters Specialty Tax Services LLC ("PSTS"). Records from the Texas Secretary of State show that PSTS was formed on August 13, 2025, with Defendant Peters as the sole managing member.

33.     Two days later, on August 15, 2025, Peters emailed his supervisor and others at CTI to announce his resignation from CTI, and his employment with CTI terminated on August 29, 2025. Peters never told CTI that he had formed PSTS, that he was planning to open his own tax consultancy, or even that he planned to continue work in the tax industry. To the contrary, Peters misled CTI about his post-resignation plans. During an exit interview before the termination of his employment, Peters told CTI that he didn't have a new position lined up for after his departure from CTI and that he wanted to explore other opportunities. Peters made similar statements to others at CTI, including his supervisor. Upon information and belief, Peters made these statements with the intent to deceive CTI because Peters intended to solicit CTI's clients and compete with CTI using CTI's confidential information, in violation of his CIPAA.

34.     Defendant PSTS's conduct and its public-facing advertising materials confirm that Peters carried through with his intention to solicit CTI's clients and compete with CTI using

CTI's confidential information, in violation of his CIPAA.  According to PSTS's website, two of PSTS's main services offered to clients are helping clients obtain federal R&D tax credits and R&D payroll tax credits—precisely the work that Peters was doing for CTI, using CTI's confidential information, before his resignation.  PSTS's website indicates that Peters is directly involved in performing these services for PSTS's clients because PSTS's "Team" consists of only three individuals: Peters (no job title listed other than "leader" of PSTS), a Strategic Advisor, and a Client Success Manager.  Upon information and belief, when PSTS offers these services to its clients, Defendants are impermissibly using CTI's confidential information, proprietary information, and trade secrets, including information about CTI's pricing, contract terms, client preferences and requirements, and specialized subject matter knowledge about R&D tax incentives that is confidential and proprietary to CTI including knowledge about the approaches towards obtaining R&D tax incentives that do and do not work in different industries and for different clients.

35.     At a minimum, Defendants have misused CTI's confidential information regarding client lists/identities and client contact information when they solicited CTI's clients and interfered with CTI's client relationships, as set forth below.

**F.     Peters Solicits CTI's Clients—in Violation of His Agreements with CTI—and Diverts a Key Client to His Own Business.**

36.     At the time of his resignation, Peters' work for CTI included managing client accounts for certain key clients.  Among the client accounts assigned to Peters were an international architectural design firm and a structural engineering firm.  In recent weeks, CTI has learned that Defendants interfered with and disrupted CTI's relationships with these key clients and impermissibly solicited these clients.

37.     The architectural design firm has been a client of CTI's for over 10 years, throughout which time CTI has performed work for this client in obtaining R&D and other tax incentives.  Through this work, CTI has developed extensive proprietary knowledge about the architectural firm's business, operations, employment practices, and contracts, as well as the best approaches for obtaining R&D tax incentives in light of those business practices.  CTI has also conducted proprietary analyses of how the architectural firm's contracts with vendors and customers could be revised to optimize the firm's ability to obtain R&D tax incentives.  In his role managing the client account for the architectural firm, Peters had access to and used all of this proprietary information.

38.     After Peters resigned from CTI in August 2025, the architectural firm's client account was assigned to a different CTI employee.  In January 2026, the architectural firm told Peters' successor that Peters had contacted the architectural firm and offered to provide R&D tax consulting services.  Peters specifically offered to consult on how the architectural firm's contracts with vendors and customers could be revised to optimize the firm's ability to obtain R&D tax incentives.  ***In other words, Peters offered to sell the architectural firm the proprietary contract analyses that CTI had conducted***.

39.     The structural engineering firm has been a client of CTI's since 2017, throughout which time CTI has performed work for this client in obtaining R&D and other tax incentives.  As for the architectural firm described above, CTI has developed extensive proprietary knowledge about the structural engineering firm's business, operations, employment practices, and contracts, as well as the best approaches for obtaining R&D tax incentives in light of those business practices.  In his role managing the client account for the architectural firm, Peters had access to and used all of the proprietary information.

40.     CTI has obtained well over one million dollars in tax credits for this client and has earned hundreds of thousands of dollars in revenue from its work for this client.  CTI entered into an automatically renewing contract with this client, meaning that CTI was in contract with this client to provide tax consulting services for this client on an ongoing, indefinite basis, unless and until the contract is cancelled.

41.     In late January 2026, CTI learned that Defendants had contacted this client, solicited the client's business, and offered to perform R&D tax consulting services of the type that CTI performed for the client.  The client then cancelled its contract with CTI, and CTI learned in February 2026 that this client began using Defendants for the services that CTI had previously provided.  By interfering with CTI's relationship with this client, Defendants caused the client to cancel a contract that would have renewed indefinitely and that was expected to generate hundreds of thousands of dollars in revenue for CTI.

42.     In doing these acts, Defendants misused CTI's confidential, proprietary, and trade-secret information.  The definition of "Confidential Information" in the CIPAA expressly includes "Client lists" and "information concerning Clients" of the type that Defendants used to contact and solicit CTI's clients.  Following the end of his employment with CTI, the CIPAA prohibited Peters from using this information for any purpose; his use of the information to contact and solicit CTI's clients was therefore a breach of Section 2 of the CIPAA.

43.     Under Sections 6 and 7 of the CIPAA, Peters was also prohibited from using this information to "[s]olicit, attempt to solicit, recruit, induce, or otherwise cause any [CTI client] to terminate their relationship with [CTI]"; prohibited from using this information to "interfere with or disrupt, the relationship, contractual or otherwise, between the [CTI] and any [CTI client]"; and prohibited from using this information in "owning, managing, operating . . . or participating

in the ownership, management, [or] operation" of . . . any business that is in competition with [CTI's business] or that offers services competitive with those offered by [CTI]." Through the actions described above, Peters breached all of these CIPAA provisions. Peters also breached Section 7 of the CIPAA when he formed PSTS during the term of his employment with CTI.

44. Upon information and belief, in providing tax consulting services to the structural engineering firm as alleged above, Defendants misused CTI's confidential, proprietary, and trade-secret information, including information regarding the client's business practices and how those practices are characterized under the applicable tax law, which approaches do and do not work to obtain tax incentives for the client, and the defensibility of different approaches for obtaining tax incentives.

### G. Peters Continues to Violate His Contractual Obligations and Misrepresent CTI's Accomplishments as His Own, Threatening Further Irreparable Harm to CTI.

45. As of the filing of this Complaint, Defendants continue to misuse CTI's confidential information, and Peters continues to breach the CIPAA as set forth above. CTI has sent a cease-and-desist letter to Defendants, but PSTS's website shows that Defendants continue to offer the R&D tax credits and R&D payroll tax credits that were the subject of Peters' work at CTI. And CTI's loss of the structural engineering firm as a client due to Defendants' misconduct occurred within the month before the filing of this Complaint.

46. Defendants' misconduct has caused CTI to suffer irreparable harm in the form of lost revenue and profits, impaired client relationships and the loss of at least one client, and loss of goodwill and reputation. Defendants' misconduct will continue to cause these and other harms to CTI unless the relief sought in this Complaint is granted.

47. CTI also expects discovery to show that PSTS's website is falsely claiming CTI's accomplishments as its own and/or providing false information about PSTS's accomplishments.

### H.    Peters' Contracts Provide for Enforcement of His Agreements through Injunctive Relief, as CTI Seeks Here.

48.    The agreements that Peters voluntarily signed and agreed to in July 2024,

included a Voluntary Arbitration Agreement, which is attached hereto as **Exhibit 2**.  Under the

Voluntary Arbitration Agreement, claims between CTI and Peters such as those asserted in this

Complaint are subject to mandatory, binding arbitration pursuant to the American Arbitration

Association's Employment Arbitration Rules.  But Section VII of the Voluntary Arbitration

Agreement expressly authorizes CTI to bring an action for equitable relief in aid of arbitration, as

CTI has done here:

> With respect to disputes arising under this Agreement that are submitted to a court rather than an arbitrator, including actions to compel arbitration, to confirm the arbitration award, or for equitable relief in aid of arbitration (which actions the parties are hereby authorized to bring), the parties agree that venue and jurisdiction are proper in the state of Texas [employee's state of residence] and the parties specifically consent to the jurisdiction and venue of such court for the purpose of any proceedings contemplated by this paragraph. If any part of this Agreement is held to be void, voidable, or otherwise unenforceable by any court or arbitrator, nothing contained herein shall limit the enforceability of any other part. This Agreement shall be applied and interpreted consistent with applicable law.

49.    Further, under Section 8.1 of the CIPAA, Peters agreed that CTI may seek

injunctive relief in Court in the event of any breach or threatened breach of the CIPAA, "in

addition to any and all other remedies available":

> [T]he Employee agrees that, in addition to any and all other remedies available to the Company at law or in equity, the Company shall be entitled to any proper injunction, including but not limited to any temporary, preliminary, or final injunction, any temporary restraining order, and any temporary protective orders, to enforce this Agreement in the event of breach or threatened breach by the Employee.

50.     Pursuant to the above provisions, CTI brings this Complaint to obtain appropriate injunctive relief (including a temporary restraining order and/or preliminary injunction) until its claims against Peters may be resolved in arbitration.  CTI intends to seek further judicial consideration only to the extent the arbitration does not fully resolve its claims.

## V.    CAUSES OF ACTION

### Count 1: Breach of Contract (CIPAA)
(Against Defendant Peters)

51.     CTI repeats and re-alleges the foregoing allegations as if fully set forth herein.

52.     Section 9.9 of the CIPAA provides that the agreement is governed by Texas law, without regard to conflicts of law principles.

53.     The CIPAA is a valid and enforceable contract under Texas law.

54.     Through the acts described above, Peters breached at least Sections 2, 6, and 7 of the CIPAA.

55.     Section 2, 6, and 7 of the CIPAA are all intended to and are necessary to protect CTI's legitimate business interests and do not impose an undue hardship on Peters.  These provisions are part of the otherwise enforceable CIPAA that serves the legitimate purposes of protecting CTI's confidential and trade secret information, as well as CTI's goodwill and advantageous business relationships with its established clients.  These provisions do not impose a greater restraint than is necessary to protect the goodwill and other legitimate business interests of CTI.

56.     In the event that any of these provisions is found to be unreasonable under the circumstances, then the provision(s) should be reformed to the maximum reasonable duration, scope, and geographic area, pursuant to the parties' agreement in Section 6.2 of the CIPAA and other applicable law.

57.     As the direct and proximate result of Peters' breach of the CIPAA, CTI suffered not only monetary damages, but has also suffered and, unless Defendants are temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm to its business and intellectual property, as well as its goodwill and advantageous business relationships with its established clients.

58.     There is no remedy at law adequate to prevent the irreparable harm occasioned by Peters' ongoing breach of contract, thereby necessitating the requested temporary, preliminary, and permanent injunctive relief.

### Count 2: Tortious Interference with Contract (CIPAA)
(Against Defendant PSTS)

59.     CTI repeats and re-alleges the foregoing allegations as if fully set forth herein.

60.     The CIPAA is a valid and enforceable agreement between CTI and Peters.

61.     As of the date of its formation, PSTS had actual knowledge of the CIPAA because Peters is the managing member of PSTS.  PSTS had actual knowledge that the acts alleged above would constitute a material breach of the CIPAA by Peters.  Nevertheless, PSTS tortiously induced Peters to breach the CIPAA and otherwise interfered with the contract, including by receiving CTI's confidential information from Peters as alleged above.  PSTS continues to tortiously induce Peters' breaches of the CIPAA.

62.     As the direct and proximate result of PSTS's tortious interference with the CIPAA, CTI suffered not only monetary damages, but has also suffered and, unless Defendants are temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm to its business and intellectual property, as well as its goodwill and advantageous business relationships with its established clients.

63.    There is no remedy at law adequate to prevent the irreparable harm occasioned by PSTS's ongoing tortious interference, thereby necessitating the requested temporary, preliminary, and permanent injunctive relief.

### Count 3: Tortious Interference with Contract (Third-Party Agreement)
(Against All Defendants)

64.    CTI repeats and re-alleges the foregoing allegations as if fully set forth herein.

65.    The agreement between CTI and the structural engineering firm described above is valid and enforceable.

66.    Prior to the formation of PSTS and his resignation from CTI, Peters had knowledge of the agreement because he was assigned to the structural engineering firm account at CTI.  Defendants had actual knowledge that the acts alleged above would interfere with and disrupt CTI's contractual relationship with the structural engineering firm.  Nevertheless, Defendants tortiously interfered with the agreement, including by misusing CTI's confidential information to improperly solicit the structural engineering firm as a client for PSTS.

67.    As the direct and proximate result of Defendants' tortious interference with the agreement, CTI suffered not only monetary damages in the form of lost revenue and profits, but also nonmonetary damages in the form of lost goodwill and advantageous business relationships.

### Count 4: Defend Trade Secrets Act ("DTSA")
18 U.S.C. § 1836 *et seq.*
(Against All Defendants)

68.    CTI repeats and re-alleges the foregoing allegations as if fully set forth herein.

69.    Plaintiff and Defendants are engaged in interstate commerce in the provision of tax consulting services.

70.    CTI's confidential and proprietary information includes, but is not limited to, information and knowledge regarding the defensibility of various approaches towards obtaining

R&D tax incentives, the audit process and results of audits, and the specific approaches that do and do not work for obtaining R&D tax incentives, including on an industry-specific and client-specific basis, as alleged above.  These categories of information are trade secrets within the meaning of 18 U.S.C. § 1839(3).

71.     Plaintiff CTI uses these trade secrets in interstate commerce to provide tax-consulting services to its clients throughout the United States.

72.     CTI derives economic value and competitive advantage from this information not being known or used by its competitors or others.

73.     CTI has taken reasonable measures to maintain the secrecy of this information, including confidentiality agreements, confidentiality policies, password restrictions, and role-based employee access restrictions.

74.     Defendants have misappropriated CTI's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, as alleged above.  Further, upon information and belief, Defendants have misused CTI's trade-secret information, including in offering and providing services to CTI's clients and others.

75.     Defendants' misappropriation was not accidental or inadvertent and instead has been willful and malicious.

76.     Defendants continue to misuse CTI's trade secrets and will continue to do so unless enjoined by the Court.

77.     As the direct and proximate result of Defendants' misappropriation of trade secrets, CTI has suffered not only monetary damages, but has also suffered and, unless Defendants are temporarily restrained and preliminarily and permanently enjoined by this Court,

will continue to suffer irreparable harm to its business and intellectual property, as well as its goodwill and advantageous business relationships with its established clients.

78.     There is no remedy at law adequate to prevent the irreparable harm occasioned by Defendants ongoing misappropriation and misuse of CTI's trade secrets, thereby necessitating the requested temporary, preliminary, and permanent injunctive relief.

**Count 5: Texas Uniform Trade Secrets Act ("TUTSA")**
Tex. Civ. Prac. & Rem. Code § 134A
(Against All Defendants)

79.     CTI repeats and re-alleges the foregoing allegations as if fully set forth herein.

80.     CTI's confidential and proprietary information includes, but is not limited to, information and knowledge regarding the defensibility of various approaches towards obtaining R&D tax incentives, the audit process and results of audits, and the specific approaches that do and do not work for obtaining R&D tax incentives, including on an industry-specific and client-specific basis, as alleged above.  These categories of information are trade secret within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.002(6).

81.     CTI derives economic value and competitive advantage from this information not being known or used by its competitors or others.

82.     CTI has taken reasonable measures to maintain the secrecy of this information, including confidentiality agreements, confidentiality policies, password restrictions, and role-based employee access restrictions.

83.     Defendants have misappropriated CTI's trade secrets in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A *et seq.*, as alleged above. Further, upon information and belief, Defendants have misused CTI's trade-secret information, including in offering and providing services to CTI's clients and others.

84.     Defendants' misappropriation was not accidental or inadvertent and instead has been willful and malicious.

85.     Defendants continue to misuse CTI's trade secrets and will continue to do so unless enjoined by the Court.

86.     As the direct and proximate result of Defendants' misappropriation of trade secrets, CTI has suffered not only monetary damages, but has also suffered and, unless Defendants are temporarily restrained and preliminarily and permanently enjoined by this Court, will continue to suffer irreparable harm to its business and intellectual property, as well as its goodwill and advantageous business relationships with its established clients.

87.     There is no remedy at law adequate to prevent the irreparable harm occasioned by Defendants ongoing misappropriation and misuse of CTI's trade secrets, thereby necessitating the requested temporary, preliminary, and permanent injunctive relief.

## VI.     **JURY DEMAND**

88.     To the extent this case raises any issues triable by jury, CTI requests a jury trial as to those issues.

## VII.     **RELIEF SOUGHT**

89.     Plaintiff prays for the following relief:

a.     That the Court promptly hear and rule on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, or in the Alternative, Temporary Restraining Order and Expedited Discovery, so as to protect CTI from imminent, irreparable harm until its claims against Peters can be resolved through arbitration; and

b.    Such other and further relief in law or equity to which CTI may show itself justly entitled, including but not limited to damages, attorneys' fees, costs, and interest to which CTI is entitled for causes of action asserted herein that are not ultimately resolved in arbitration.

DATED: February 23, 2026                    Respectfully submitted,


By:    */s/ Laura W. Duncan*
Laura W. Duncan
Fanny B. Turcios
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd., Suite 900
Houston, TX  77027
Telephone: (713) 355-5000
Facsimile: (713) 355-5001
lduncan@kelleydrye.com
fturcios@kelleydrye.com


Anthony P. Schoenberg, *(Pro Hac Vice Forthcoming)*
Tim Horgan-Kobelski, *(Pro Hac Vice Forthcoming)*
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone:  (415) 954-4400
Fax:  (415) 954-4480
tschoenberg@fbm.com
tkobelski@fbm.com

Attorneys for Plaintiff CTI III, LLC